In the Matter of the **EXTRADITION OF Mousa Mohammed Abu MARZOOK.**

In the Matter of Dr. **Mousa Abu MARZOOK, Petitioner,**

v.

Warren **CHRISTOPHER, as Secretary of State; Doris Meissner, as the Director of the Immigration and Naturalization Service; The United States Immigration and Naturalization Service; Carol D. Chasse, as Regional Director of the Immigration and Naturalization Service; R. Reish, as Warden of the Metropolitan Correctional Center; and The United States of America, Respondents.**

Nos. 95 Cr. Misc. 1, P. 16, 95 Civ. 9799 (KTD).

United States District Court, S.D. New York.

May 7, 1996.

---

Stanley L. Cohen, New York City, Marc Van Der Hout, San Francisco, CA, for Petitioner.

Honorable Mary Jo White, United States Attorney, Southern District of New York, (Baruch Weiss, Robert Buehler, Assistant United States Attorneys, of counsel), New York City, Kenneth J. Harris, United States Department of Justice, Office of International Affairs, Washington, DC, for Respondents.

KEVIN THOMAS DUFFY, District Judge.

This is an extradition proceeding in which the Government of Israel seeks the extradition of Mousa Mohammed Abu Marzook ("Abu Marzook"), the admitted leader of the political wing of the Islamic Resistance Movement, known by its acronym "Hamas."[1] According to Abu Marzook, Hamas seeks the establishment of a Palestinian identity and homeland, partly through a campaign of providing education, health care, and other social services, as well as political awareness of Palestinian issues. Admittedly, however, there is a "military wing" of Hamas, which engages in hostile activities in Israel. Israel alleges that the military wing of Hamas has engaged in a series of acts denominated as terrorist acts in Israel. Among these acts are the ones for which Israel seeks the extradition and trial of Abu Marzook.

Specifically, Israel charges Abu Marzook with crimes relating to the following ten incidents: (1) the bombing at a beach in Tel Aviv on July 28, 1990, which killed a Canadian tourist; (2) the stabbing deaths of three civilians working in a factory in Jaffa on December 14, 1990; (3) the January 1, 1992, shooting death of a civilian as he drove his car in Kfar Darom in Gaza; (4) the shooting death of a civilian as he drove his car in the Beit La'hiah region of Gaza on May 17, 1992; (5) the stabbing deaths of two civilians working at a packing plant in Sajaeya on June 25, 1992; (6) the gun-fire attack by three persons of a passenger bus in Jerusalem on July 1, 1993, in which two civilians were killed and others were injured; (7) the bombing of a passenger bus in Afula on April 6, 1994, which killed eight civilians and injured forty-six; (8) the bombing of a passenger bus in Hadera on April 13, 1994, which killed four civilians and injured twelve; (9) the machine-gun attack in a pedestrian mall in Jerusalem on October 9, 1994, which killed one civilian and injured eighteen; and (10) the bombing of a bus in Tel Aviv on October 19, 1994, which killed twenty-two civilians and injured forty-six. Israel has charged Abu Marzook with the following crimes: murder, attempted murder, manslaughter, causing harm with aggravating intent, harm and wounding under aggravating circumstances, and conspiracy to commit a felony.

This court's responsibility in the proceeding is governed by Title 18, United States Code, Section 3184, and by the Convention

---

1. Counsel for Abu Marzook, Stanley L. Cohen, has made a public statement that he expects this extradition proceeding to take years. Apparently, Mr. Cohen expects to delay the proceeding by his refusal to comply with any schedule set by this Court. The delays end now.

I have considered each of his arguments and his proffers of testimony of proposed witnesses. I have also heard testimony of one of his witnesses. This Memorandum and Order, however, is being filed despite Mr. Cohen's stated desire for time to review certain magazine articles submitted by Israel.

The Israeli government introduced certain magazine articles at the hearing, and Mr. Cohen, at the time, evidenced great interest in introduc-ing the entire magazines or at least other matters from the magazines. The U.S. Attorney obtained the magazines from Israel and informed Mr. Cohen that he could pick up copies and examine the originals. As of this date, Mr. Cohen has not picked up the copies nor examined the originals. I assume this matter has been abandoned. In light of an admission made by Mr. Cohen (see, infra, pp. 579, 580 n. 15), any evidence elicited from the magazines by Mr. Cohen would be properly excluded.

The parties have also been promising an agreed translation of certain tape recordings. I have not considered those tape recordings. The differences in translation are, therefore, immaterial. The delay in this is in great part due to tactics employed by counsel for Abu Marzook.

on Extradition, Dec. 10, 1962, U.S.–Isr., 14 UST 1707, 18 UST 382 (the "Convention"). Articles I and II, *inter alia*, of the Convention describe the responsibility of the United States to extradite an accused:

### ARTICLE I

Each Contracting Party agrees ... to deliver up persons found in its territory who have been charged with ... any of the offenses mentioned in Article II of the present convention committed within the territorial jurisdiction of the other....

### ARTICLE II

Persons shall be delivered up according to the provisions of the present Convention for prosecution when they have been charged with ... any of the following offenses:

1. Murder.

2. Manslaughter.

3. Malicious wounding; inflicting grievous bodily harm.

.      .      .      .      .

Extradition shall also be granted for attempts to commit or conspiracy to commit any of the offenses mentioned in this Article provided such attempts or such conspiracy are punishable under the laws of both Parties by a term of imprisonment exceeding three years.[2]

Where, as here, Israel has issued a criminal complaint and requested the extradition of a person, Title 18, Section 3184 requires a hearing so that "the evidence of criminality may be heard and considered." 18 U.S.C. § 3184 (West Supp.1995). If, after a consideration of such evidence, I find that there is probable cause to believe that Abu Marzook is criminally liable for the charged crimes, I must certify that finding to the Secretary of

State. 18 U.S.C. § 3184 (West Supp.1995); *see also Austin v. Healey,* 5 F.3d 598, 605 (2d Cir.1993); *cert. denied,* —— U.S. ——, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994).

**Petition for Habeas Corpus**

Abu Marzook filed a petition for *habeas corpus* in November 1995. In his petition, he asserts that the statute governing the extradition procedure, 18 U.S.C. § 3184, is unconstitutional and that this court, therefore, lacks jurisdiction to hold the statutorily required evidentiary hearing. (Hab.Mem. at 42).[3] He raised this issue again in his papers opposing the request for extradition.

■ *Habeas* review of extradition proceedings is generally deferred until after a finding of extraditability has been made. *See Vardy v. United States,* 529 F.2d 404, 406 (5th Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); *Cherry v. Warden,* No. 95 Cr.Misc.P. 7 (LB), 1995 WL 598986, at *2 (S.D.N.Y. Oct. 11, 1995). However, a petition for writ of *habeas corpus* may be entertained earlier in unusual circumstances. *In re Extradition of McMullen,* 769 F.Supp. 1278, 1281 (S.D.N.Y.1991); *aff'd in part and rev'd in part on other grounds,* 989 F.2d 603, *cert. denied,* 510 U.S. 913, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993). Abu Marzook argues that a lack of jurisdiction is sufficient "unusual circumstances" to warrant an earlier consideration of the petition. Because I find that this Court has jurisdiction to hold the extradition hearing, I deny Abu Marzook's petition for *habeas corpus.*

Abu Marzook presents two arguments against the constitutionality of Section 3184: (1) that a judicial determination of extraditability is neither final nor binding on the Executive Branch (Hab.Mem. at 50); and (2) that extradition decisions are subject to executive revision (Hab.Mem. at 53).[4] Both argu-

---

**2.** Article II also provides that extradition shall be granted for participation in any of the offenses mentioned in that Article.

**3.** The reference "Hab. Mem." is to Marzook's Memorandum in Support of Petition for Habeas Corpus.

**4.** There are strong arguments that the wording of the statute does not allow for executive review of

the extradition judge's decision and is not unconstitutional. *See In re Extradition of Sutton,* 905 F.Supp. 631, 635 (E.D.Mo.1995); *In re Extradition of Lang,* 905 F.Supp. 1385, 1391 (C.D.Cal. 1995); *see also Carreno v. Johnson,* 899 F.Supp. 624, 629–30 (S.D.Fla.1995). Marzook argues, however, that despite the statute's wording, the Executive Branch has interpreted the statute to allow for such a review.

ments would more appropriately be combined and treated as a separation of powers argument, as was done by the court in *Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C.1995), *vacated on jurisdictional grounds*, 82 F.3d 1081 (D.C.Cir.1996) (vacating for lack of jurisdiction and ordering dismissal).[5] The argument, as stated in *Lobue*, is this: "Executive Branch Review of an Extradition Judge's Legal Determinations Is Unconstitutional." *Id.* at 70.

In order to fully address this argument, the extradition process requires some exegesis. Extradition, which is a foreign affairs function, lies almost totally within the province of the Executive Branch and, in this case, is governed by the Convention on Extradition between the United States and Israel. Article V of the Convention states:

> Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, ... *to justify his committal for trial* if the offense of which he is accused had been committed in that place....

Convention, Art. V (emphasis added).

■ The laws of the United States require that, to justify the committal of an accused for trial, there must be a finding of probable cause that an offense was committed and that the accused committed it. *See* Fed.Rule Crim.Proc. 5.1(a). Thus, Section 3184 of Title 18 requires the extradition judge to make a probable cause determination regarding the charged offenses. 18 U.S.C. § 3184;[6] *see Austin*, 5 F.3d at 605 ("[t]he evidence presented need only 'support a reasonable belief that [the respondent] was guilty of the crime[s] charged.' "). If the extradition judge decides that the accused is extraditable, the judge must certify that finding to the Secretary of State. 18 U.S.C.

§ 3184. If the judge finds that the accused is not extraditable, the requesting country can again request extradition.

■ Abu Marzook asserts that Section 3184 violates the principle of separation of powers because the Secretary of State may disregard, or even disagree with a court's determination that a person is extraditable. Abu Marzook also states that the Secretary may seek to extradite a person numerous times despite each court's determination that the person is not extraditable. Because the determination of the extradition court has no *res judicata* effect, Abu Marzook argues, the Executive Branch is given impermissible power over decisions of the Judicial Branch.

I must reject Abu Marzook's reasoning, as it inverts the proper analysis for a separation of powers argument. Abu Marzook assumes that no judicial pronouncement may ever be rejected by the Executive Branch. However, as described below, a separation of powers analysis is not so cut and dry.

■ The separation of powers principle is based on the idea that "the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989). However, as the Supreme Court has made clear, "the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct." *Id.* Our system of government imposes overlapping responsibility upon the Branches. *Id.* at 381, 109 S.Ct. at 659. As Justice Jackson has stated in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J. concurring):

There are also serious questions about Abu Marzook's standing to challenge the constitutionality of the statute. *See Lang*, 905 F.Supp. at 1391–1401. Nonetheless, because the issue of standing has not been briefed, I have considered the arguments for and against the constitutionality of the statute.

5. Indeed, Abu Marzook urges me to adopt the analysis of *Lobue* in its entirety. (Hab.Mem. at 46 n. 7).

6. The relevant portion of this statute is as follows:

> the evidence of criminality may be heard and considered.... If on such hearing, [the judge] ... deems the evidence sufficient to sustain the charge under the provisions of the proper treaty, he shall certify the same ... to the Secretary of State....

18 U.S.C. § 3184.

While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

The concern of the separation of powers principle is the encroachment and aggrandizement of one branch at the expense of the other. *Mistretta*, 488 U.S. at 382, 109 S.Ct. at 660. In fact, the Supreme Court has "upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment." *Id.* (citing *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986)).

In the case of Section 3184 extradition hearings, there is no impermissible encroachment or aggrandizement of power by either the Executive or Judicial Branch. Extradition is an Executive Branch function, not an Article III function of the judiciary. *See Austin*, 5 F.3d at 603. Section 3184 does not alter this balance, as the final decision of whether to extradite remains with the Executive.

The task of determining extraditability has been assigned to the courts by legislation in order to protect fundamental individual rights and liberty. *See Austin*, 5 F.3d at 603–04. The delegation of this task is not unconstitutional unless Congress has vested in the Judiciary "powers that are more appropriately performed by the other Branches." *See Mistretta*, 488 U.S. at 385, 109 S.Ct. at 661. Abu Marzook does not claim that the Executive Branch is better suited to make a determination of whether probable cause exists. In fact, Federal courts have traditionally been charged with making probable cause determinations, whether for purposes of issuing an arrest warrant, for a preliminary examination, or for issuance of search warrants.[7] The tasks performed by an extradition judge are primarily judicial and are ones that are performed daily by the courts. Section 3184 does not represent an improper aggrandizement of power to the Judicial Branch, but instead represents a realization by the Executive and Legislative Branches that the judiciary is better prepared to make such determinations. *Cf. Morrison*, 487 U.S. at 676 n. 13, 108 S.Ct. at 2611 n. 13 (upholding another statute because judges were not "given power ... in an area in which they have no special knowledge or expertise.").

Furthermore, the statutory scheme does not vest all aspects of extradition in the Judicial Branch. The Judiciary does not decide whether to extradite; that decision remains in the hands of the Executive Branch.[8] Were it the other way, an argument could be made that the statute improperly assigns foreign affairs powers to the Judiciary. *Cf. Morrison*, 487 U.S. at 691, 108 S.Ct. at 2619 ("the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty...."); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). In *Chicago & Southern*, the Supreme Court explained that foreign affairs questions are not the province of the Judiciary, stating:

> the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.... They are decisions of a kind for which the Judiciary has neither aptitude,

---

**7.** *See* Fed. Rules Crim.Proc. 4, 5.1(a), 9(a), 32.1(a), 41. In *Mistretta*, the Supreme Court noted that "Federal Courts ... participate in the issuance of search warrants, *see* Fed. Rule Crim. Proc. 41, and review wiretap applications, *see* 18 U.S.C. §§ 2516, 2518 (1982 ed. and Supp. IV)." *Mistretta*, 488 U.S. at 390 n. 16, 109 S.Ct. at 664 n. 16. The carrying out of these orders, of course, is performed by the Executive Branch.

**8.** The analogy to arrest warrants is especially strong. If a court issues an arrest warrant, it is the Executive which determines whether to prosecute. This happens every day, and yet it would be absurd to conclude that our entire criminal justice system violates the separation of powers principle.

facilities nor responsibility and have long been held to belong in the domain of political power *not subject to judicial intrusion or inquiry.*

*Id.* at 111, 68 S.Ct. at 436 (citations omitted) (emphasis added).

Even the court that decided *Lobue* realized that the Executive must have freedom to decide issues of foreign policy. *Lobue,* 893 F.Supp. at 76 & n. 16. That court ruled that the Executive could rely on any basis for its decision not to extradite, so long as the basis remained unspoken. *Id.* Under that court's reasoning, however, the statute becomes unconstitutional when the Executive is permitted to say that the court erred in its legal analysis. *Lobue,* 893 F.Supp. at 76 n. 16 ("[Diplomacy] does not mean that the Secretary may impugn the competence of the Judiciary as he does when he says to a requesting country (or to the American people), 'If it had been within my power, I would certainly have surrendered that person; unfortunately, the extradition judge's conclusion was erroneous, and the accused was not, in fact, legally extraditable.' ").

I believe the Judiciary should not be so vain as to reject a statutory scheme on that ground. Since almost the foundation of this Republic, politicians have hidden behind judicial opinions when forced to make difficult decisions. The nature of foreign policy is political, *Chicago & Southern,* 333 U.S. at 111, 68 S.Ct. at 436, and if the Executive must use the courts as an excuse for not extraditing a person, that decision is not subject to judicial intrusion or inquiry. *See id.*

Because Section 3184 allows the Executive to exercise its foreign policy powers without interference from the Judiciary, there is no impermissible encroachment by the Judiciary upon executive functions. Having found that the statute in question is not unconstitutional, I find that this court has jurisdiction to hold the extradition hearing.

On the other hand, acceptance of Abu Marzook's unconstitutionality argument would, in effect, render his own extradition a matter of pure executive discretion. Assuming the extradition statute to be unconstitutional, the judicial involvement in extradition would be removed. As of now, there is no procedure for an administrative hearing in the Executive Branch to determine probable cause, nor is there an individual or group with real expertise in such matters. Once the executive decision would be made, any judicial review of the probable cause determination would be strictly limited, at best, to the standards for *habeas corpus.* Clearly in such a scenario most of the Executive Branch's decision would be *purely political* and thus outside the scope of judicial review.[9]

**The Applicable Law**

Having found that this court has jurisdiction to hold the required hearing, I must determine whether the evidence is sufficient to find that probable cause exists for the charged crimes. The issue of which law to apply must be resolved, of course, before a finding of probable cause can be made. Article V of the Convention provides that extradition shall be granted only if probable cause exists "according to the *laws of the place where the person sought shall be found.*" (emphasis added).

■■■ Counsel for Abu Marzook argues that I must look solely to the laws of New York when determining whether probable cause exists. According to Abu Marzook, he could not be liable for the substantive crimes charged if New York law governs. New York courts have rejected the federal conspiracy law, as enunciated in *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, *reh'g denied,* 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697 (1946), whereby all members of a conspiracy can be held liable for the substantive crimes committed in furtherance of the conspiracy. *See People v. McGee,* 49 N.Y.2d 48, 57, 424 N.Y.S.2d 157, 162, 399 N.E.2d 1177, 1181–82 (1979), *cert. denied sub nom., Waters v. New York,* 446 U.S. 942, 100 S.Ct. 2166, 64 L.Ed.2d 797 (1980). In *McGee,* the New York Court of Appeals held that "[a]ccessorial conduct may

9. This was the problem Congress sought to avoid by creating a role for the judiciary in extradition proceedings. *See Austin,* 5 F.3d at 604.

not be equated with mere membership in a conspiracy and the State may not rely solely on the latter to prove guilt of the substantive offense." *Id.* According to Abu Marzook, Israel's proof against him is based solely on his alleged membership in a conspiracy. Thus, he argues, under New York law, he could not be found guilty of the crimes of murder, attempted murder, manslaughter, causing harm with aggravating intent, or harm and wounding under aggravating circumstances.[10]

I stated in another case that the phrase "the laws of the place where the person sought shall be found" required me to look to the law of the state where the accused was arrested rather than to the laws of the United States. *In re Extradition of Locatelli,* 468 F.Supp. 568, 572 (S.D.N.Y.1979). In doing so, I relied on a similar statement by Judge Friendly in the case of *Shapiro v. Ferrandina,* 478 F.2d 894 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). In neither case, however, did the apparent rejection of federal law affect the outcome of the decisions. Thus, the rejection of federal law was mere dicta.[11]

On mature reflection, I now hold that the laws of both the United States and the state where the accused was arrested may be considered when determining extraditability of the accused. My holding on this issue is derived from an analysis of the plain language of the Convention and of *Wright v. Henkel,* 190 U.S. 40, 59, 23 S.Ct. 781, 785, 47 L.Ed. 948 (1903), and *Pettit v. Walshe,* 194 U.S. 205, 211, 24 S.Ct. 657, 658, 48 L.Ed. 938 (1904)—the two Supreme Court cases relied on by the Court of Appeals in *Shapiro.*

As the Convention is a treaty between two sovereign nations, the time-honored phrase "laws of the place where the person sought shall be found" must refer to the laws of the sovereign nation in which the accused has been found. When the United States is that place, therefore, the laws of the United States govern whether an accused is extraditable. Rationally construed, the Convention would make sense to Israel as a sovereign nation only if it could look to United States federal laws to measure the extraditability of an accused. How destructive it would be to both foreign relations and the overall good of the *res publica* if a felon could escape extradition because of the peculiarities of some state law! Sovereign nations would be loathe to enter extradition treaties with this country if they had to examine the peculiarities of the statutes and common law of fifty separate jurisdictions.

Unlike most nations, however, the United States does not have a complete body of federal criminal law: the federal criminal statutes are limited, and federal common law crimes are non-existent. It is for this reason that, on lands under the exclusive jurisdiction of the United States (where the body of federal criminal laws would otherwise be very limited) Section 13 of Title 18 provides for the assimilation of state penal laws into the federal law. *See* 18 U.S.C. §§ 7, 13.

---

10. I believe there well may be sufficient evidence to establish probable cause that Abu Marzook would be liable under New York State penal laws. The Israeli evidence shows that, with knowledge that the military wing of Hamas planned terrorist acts, *see infra* pp. 585–91, Abu Marzook not only chose the head of the military wing of Hamas, but also gave him money to finance such operations. *See infra* pp. 588–91, & 591–92. It is the Israeli position, which stands unrefuted, that the crimes detailed in the Extradition Request all flowed from this activity. This would appear sufficient for accomplice liability under New York law, since it could be said that Abu Marzook "solicit[ed], request[ed], command[ed], [or] importun[ed] . . . such conduct." N.Y. Penal Law § 20.00 (McKinney's 1987) (accessorial liability). Moreover, the evidence supports a reasonable inference that Abu Marzook

recklessly engaged in conduct which created a grave risk of death to another person under circumstances evincing a depraved indifference to human life. Thus, the mental culpability required by New York's murder, manslaughter, and assault statutes is present. *See* N.Y. Penal Law §§ 125.25 (murder 2°), 125.15 (manslaughter 2°), 125.20 (manslaughter 1°), 120.05 (assault 2°), 120.10 (assault 1°) (McKinney's 1987).

I expressly decline to make any ruling on New York State law.

11. It is interesting to note that the Court of Appeals in *Shapiro* employed federal law, not state law, to determine whether a particular crime was "punishable by more than three years" imprisonment and, thus, extraditable under the treaty. *Shapiro,* 478 F.2d at 910. The court also used federal law to determine the effect of the statute of limitations. *Id.* at 913.

Similarly, United States courts historically often have looked to state criminal laws to determine whether an accused is extraditable.

The Supreme Court decision in *Wright* involved a charge of fraud, which was not a federal crime but was a crime in New York— the state where the accused had been arrested. 190 U.S. at 59, 23 S.Ct. at 785. The Court posed the rhetorical question: "is the language of the treaty, 'made criminal by the laws of both countries,' to be interpreted as *limiting its scope to acts of Congress,* and eliminating the operation of the laws of the states?" *Id.* at 58–59, 23 S.Ct. at 785 (emphasis added). The Court answered its own question by stating that

> [such a] view would largely defeat the object of our extradition treaties by ignoring the fact that, for nearly all crimes and misdemeanors, the laws of the states, and not the enactments of Congress, must be looked to for the definition of the offense. *There are no common-law crimes of the United States,* and indeed, in most of the states the criminal law has been recast in statutes....

*Id.* (emphasis added). The Court also stated that "when, by the law of [the requesting nation], and by the law of the state in which the fugitive is found, the ... acts charged to have been committed are made criminal, the case comes fairly within the treaty, *which otherwise would manifestly be inadequate to accomplish its purposes.*" *Id.* at 61, 23 S.Ct. at 786 (emphasis added). Thus, the Court's holding was that a finding of extraditability was not limited to federal law, but was to be supplemented by state law.

In *Pettit v. Walshe,* the Court relied on *Wright* to interpret the phrase "laws of the place where the fugitive or person so charged shall be found." 194 U.S. 205, 211, 24 S.Ct. 657, 658, 48 L.Ed. 938 (1904). The Court stated that this language

> might be construed as referring to this country as a unit, as it exists under the Constitution of the United States. But as there are no common-law crimes of the United States, and *as the crime of murder, as such, is not known to the national government,* ..., the better construction of

the treaty is, that the required evidence as to the criminality of the charge against the accused must be such as would authorize his apprehension and commitment for trial in that state of the Union in which he is arrested.

*Id.* at 217, 24 S.Ct. at 661 (emphasis added).

Nothing in either *Wright* or *Pettit* states or suggests that the laws of the United States should be totally rejected in sole favor of state laws. Instead, the Court was concerned that an undue focus on federal law would lead to an improper refusal to extradite. The Court, therefore, interpreted the treaties broadly to favor extradition, even though the crimes charged were not crimes under the federal statutes. It would be absurd for the United States to deny extradition on the basis that the charged crime— though a violation of federal criminal laws— is not a crime in the state where the accused is arrested. The dicta to the contrary in *Locatelli* and *Shapiro* are clearly in error.

It should be noted that *Wright* and *Pettit,* and even *Shapiro,* were all decided before the plethora of federal criminal statutes which have cascaded out of Washington D.C. and into the law books over the last few decades. We now have a federal "murder" statute (18 U.S.C. § 1111). Practically every fraud is either a mail fraud (18 U.S.C. § 1341) or a wire fraud (18 U.S.C. § 1343) (West Supp.1996). The federal RICO statute (18 U.S.C. § 1961) covers almost everything. And we lately have received specialized federal criminal statutes on everything from sexual abuse (18 U.S.C. § 2241), domestic violence (18 U.S.C. § 2261), genocide (18 U.S.C. § 1091), and terrorism (18 U.S.C. § 2331), to federal criminal sections guarding the sanctity of state motor vehicle records (18 U.S.C. § 2721). With the advent of "federalizing" all crime, less and less will we need to look to state law.

█ In any event, Abu Marzook was taken into the custody of the Immigration and Naturalization Service of the federal government while attempting to enter the United States at John F. Kennedy Airport. He had not cleared customs and had not been admitted to the United States. Exclusion proceed-

ings had commenced prior to the request for extradition. Technically, Abu Marzook was "found" at the border, and not in New York. *See Leng May Ma v. Barber,* 357 U.S. 185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1958) ("detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States"); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215, 73 S.Ct. 625, 630, 97 L.Ed. 956 (1953). In such a case, federal law applies.

As the laws of the United States may appropriately be used to determine extraditability, I reject Abu Marzook's invitation to deny extradition on the basis that the evidence does not support a finding of criminal liability under New York law.

### Scope of the Extradition Treaty

■ Abu Marzook argues that the Israeli warrant for his arrest does not charge him with an extraditable offense. (Extrad.Mem. at 38).[12] The warrant charges him with, *inter alia,* "conspiracy to commit a felony," and with several substantive crimes of the conspiracy. According to Abu Marzook, however, conspiracy to commit a felony is not an extraditable crime under the Convention. (Extrad.Mem. at 39). Abu Marzook also argues that

> Israel originally charged Dr. Abu Marzook with conspiracy to commit murder, manslaughter—all crimes which were extraditable. Israel thereafter [in a superceding warrant] decided *not* to charge Dr. Abu Marzook with these crimes and instead a more generic, but distinct, criminal offense—conspiracy to commit a felony. The necessary implication is that the felony Dr. Abu Marzook has allegedly conspired to commit is not murder, manslaughter, or intentional harm but some other felony. What is clear is Israel has not specified which felony and, standing alone, Conspiracy to Commit a Felony is not an extraditable offense.

(*Id.;* Response to Gov't Answer, dated May 3, 1996, at 5–6).

---

12. Citations to Abu Marzook's response to the request for extradition are referred to herein as

The extradition complaint makes clear that the conspiracy charged to Abu Marzook is the conspiracy to commit the enumerated crimes listed in the arrest warrant. The Israeli conspiracy statute is titled "Conspiracy to commit a felony or misdemeanor." (Extrad.Compl. at 13). Both the original and the superseding warrant charged Abu Marzook with conspiracy under this statute.

The Israeli conspiracy statute states as follows:

> (a) A person who conspires with another to commit a felony or misdemeanor ... is liable—
>
> (1) if the offense is a felony, to imprisonment for seven years or to the punishment prescribed for that offense, whichever is the lighter punishment; ....

*Id.* Thus, it is clear for example that by charging Abu Marzook with murder and conspiracy to commit a felony, Israel has charged him with conspiracy to commit murder. Since the Convention on Extradition covers conspiracy to commit murder, Abu Marzook has been charged with an extraditable offense.

Moreover, Abu Marzook's argument was squarely rejected by the Court of Appeals for this Circuit in *Shapiro,* 478 F.2d at 909–10. Indeed *Shapiro* involved the exact same treaty with Israel and the exact same charge of "conspiracy to commit a felony." The only difference between the two is that in *Shapiro* the felony object of the conspiracy was fraudulent investment enterprises.

■ Although not raised by Abu Marzook, I note that two of the substantive crimes set forth in the Israeli warrant are not listed *per se* in Article II of the Convention. The warrant charges Abu Marzook with, *inter alia,*

> 4. Causing Harm with Aggravating Intent (in violation of Israeli Penal Law § 329).
>
> 5. Harm and Wounding under Aggravating Circumstances (in violation of Israeli

"Extrad.Mem. at ——."

Penal Law § 335(1) together with §§ 333, 334).

The pertinent sections of the Israeli Penal Code are contained in the "Request for Extradition" and read as follows:

§ 329. *Harm with aggravating intent*

A person who does one of the following with intent to disable, disfigure or do grievous harm to another or to resist or prevent the lawful arrest or detention of himself or another is liable to imprisonment for twenty years:

(1) unlawfully wounds or does grievous harm to a person;

(2) unlawfully attempts to strike a person with a projectile, knife or other dangerous or offensive weapon;

(3) unlawfully causes an explosive substance to explode;

(4) sends or delivers an explosive substance or other dangerous or noxious thing to a person or causes a person to receive any such substance or thing;

(5) puts a destructive or explosive substance or a corrosive fluid in any place;

(6) throws any substance or fluid mentioned in paragraph (5) at a person or otherwise applies it to his body.

§ 333. *Grievous harm*

A person who unlawfully does grievous harm to another person is liable to imprisonment for seven years.

§ 334. *Wounding*

A person who unlawfully wounds another person is liable to imprisonment for three years.

§ 335. *Harm and wounding under aggravating circumstances*

Where an offense under section 333 or 334 is committed—

(1) while the offender carries a firearm or cutting weapon, he is liable to double the penalty prescribed for the offense;

(2) in the presence of two or more persons who have combined for the commission of the act by one or some of them, each of them is liable to double the penalty prescribed for the offense.

It appears to me that these crimes are included in the Convention at Article II subdivision three, which lists as an extraditable offense "Malicious wounding; inflicting grievous bodily harm."

The parallel section of the U.S.Code is found in Title 18, Section 113 which provides:

(a) Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of assault shall be punished as follows:

(1) Assault with intent to commit murder, by imprisonment for not more than twenty years.

(2) Assault with intent to commit any felony, except murder or a felony under chapter 109A [*i.e.* sexual abuse], by fine under this title or imprisonment for not more than ten years, or both.

(3) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine under this title or imprisonment for not more than ten years, or both.

. . . . .

(6) Assault resulting in serious bodily injury, by fine under this title or imprisonment for not more than ten years, or both.

. . . . .

(b) As used in this subsection—

(1) the term "substantial bodily injury" means bodily injury which involves—

(A) a temporary but substantial disfigurement; or

(B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty; and

(2) the term "serious bodily injury" has the meaning given that term in section 1365 of this title [*i.e.* bodily injury which involves—(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the

function of a bodily member, organ, or mental faculty].

18 U.S.C. § 113 (West Supp.1996).

Even if this Court were to use New York state law (either as assimilated under 18 U.S.C. § 13 or otherwise) there would be a statute parallel to those for which Marzook is charged. *See* N.Y. Penal Law §§ 120.05 (assault 2°), 120.10 (assault 1°) (McKinney's 1987). Thus, I conclude that all of the crimes charged against Abu Marzook are extraditable offenses under the Convention.

■ The Israeli warrant is supported by affidavits (with attachments) filed by various police officials. It lists the penal law sections that are allegedly violated by the incidents recited in the affidavits. The warrant does not follow our federal procedure of listing separate counts and describing for each count how the relevant statute has been violated. Instead, the Request for Extradition merely summarizes the ten incidents as if there were ten "counts." This procedure appears acceptable. I hold that each of the alleged incidents comprise crimes which are extraditable offenses. In doing so, I assume that the punishment for each incident and for each crime committed on a different victim may be consecutive. However, although Abu Marzook may be charged with violating several statutes with regard to each victim, his punishment must not result in multiplicitous consecutive sentences.

**Political Offense Exception**

■ Abu Marzook asserts that "the request for extradition must be denied as the acts charged in this case are of a political character outside the purview of the treaty of extradition." (Extrad.Mem. at 46). He also argues that the request for extradition has been made "with a view to trying and punishing him for an offense of a political character." (Extrad.Mem. 75).

■ The political offense exception arises out of the Article VI language of the Convention on Extradition, which states:

Extradition shall not be granted in any of the following circumstances:

⋅    ⋅    ⋅    ⋅    ⋅

4. When the offense is regarded by the requested Party as one of a political character or if the person sought proves that the request for his extradition has, in fact, been made with a view to trying or punishing him for an offense of a political character.

An offense falls within this exception if the offense was incidental to a severe political disturbance. *See, e.g., Ahmad v. Wigen,* 726 F.Supp. 389, 401 (E.D.N.Y.1989), *aff'd,* 910 F.2d 1063 (2d Cir.1990); *Sindona v. Grant,* 619 F.2d 167, 173 (2d Cir.1980).

In a Memorandum dated April 11, 1996, I rejected Abu Marzook's offer of evidence on this issue. He contended that the proffered testimony would support his assertion that the charged offenses were incidental to the occurrence of a severe political disturbance and, therefore, would fall within the political offense exception to the Convention.

This approach, however, reverses the appropriate way of looking at the political offense exception. In my Memorandum, I held that if the act complained of is of such heinous nature that it is a crime against humanity, it is necessarily outside the political offense exception. Thus, if any of the charges against Abu Marzook are crimes abhorrent to human nature, the political offense exception will not lie in this case.

The charges leveled by Israel clearly bring this matter outside the realm of the political offense exception. The indiscriminate bombing of buses laden with civilians and other such types of attacks targeted at civilians do not advance any political motive other than as terrorist acts.[13] Such attacks have been universally condemned, even when they occur during a declared war, and clearly are less tolerable when committed by terrorists. *See* Convention Relative to the Protection of Civilian Persons in Time of War, *entered into force* Oct. 21, 1950, *for the United States* Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75

---

13. One definition of terrorism is that it is indiscriminate violence toward civilians to terrorize the citizenship at large.

U.N.T.S. 287 [hereinafter "the Geneva Convention"]. Article 3 of the Geneva Convention states that

> Persons taking no active part in the hostilities ... shall in all circumstances be treated humanely, ...
>
> To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>
> (a) violence to life and person, *in particular murder of all kinds, mutilation, cruel treatment and torture.*

*Id.* (emphasis added); *See also Kadic v. Karadžić,* 70 F.3d 232, 242–43 (2d Cir.1995), *reh'g denied,* 74 F.3d 377 (1996).

Indeed, the Court of Appeals for this Circuit has rejected the political offense exception under facts similar to these. *Ahmad v. Wigen,* 910 F.2d 1063, 1066 (2d Cir.1990) ("We agree that an attack on a commercial bus carrying civilian passengers on a regular route is not a political offense"). And, in a more recent decision, this Circuit reaffirmed the application of the Geneva Convention to acts of terrorism. *See Kadic,* 70 F.3d at 242–43 (stating that Article 3 "binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents").

Since the political offense exception will not lie in this case, the proffered testimony of Abu Marzook's proposed witnesses on this issue was not relevant and had to be rejected. The political offense exception is not available under the facts alleged here.

Abu Marzook also sought to introduce evidence concerning the political motivation of Israel in bringing charges against him and of the United States in cooperating in the extradition. Simply put, however, the political motivation of the prosecution is not a business in which this court may delve. *Eain v. Wilkes,* 641 F.2d 504, 516 (7th Cir.) ("evaluations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion"), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *see also In re Extradition of Mackin,* 668 F.2d 122, 133 (2d Cir.1981) (citing with approval *Eain v. Wilkes* ).

▮ Somewhat akin to the political offense exception argument, Abu Marzook also sought to make an issue of and to produce proof as to whether or not the Israeli legal system will give him "due process."

I discussed this in my Memorandum of April 11, 1996, and rejected the testimony because the issue is not properly before me. It hardly needs citation to point out the United States Constitution cannot apply to a foreign jurisdiction, particularly where as here that jurisdiction is dealing with a person who is not a United States citizen. While it is true that Abu Marzook has been a resident in the United States for a number of years and that some of his children have United States citizenship by birth, he has chosen to maintain his former citizenship, and he has not even applied for United States citizenship. The motives behind this choice might be quite laudable—Abu Marzook may perceive himself as someone who would return to his native land to lead his people—but having made that choice, he cannot now insist on some kind of extraterritorial constitutional protection.

That is not to say that the Israeli system does not accord a criminal defendant basic human rights. Judge Jack Weinstein conducted an extensive investigation into that question in the case of *Ahmad v. Wigen,* 726 F.Supp. 389, 409–20 (E.D.N.Y.1989), *aff'd,* 910 F.2d 1063 (2d Cir.1990). That case shows clearly that criminal defendants are accorded basic human rights, both in theory and in fact, by the Israelis. The theory is spelled out in detail by Judge Weinstein. The fact is that Ahmad was acquitted after his extradition to Israel. In any event, the law in this Circuit is that such an inquiry is improper for the extradition magistrate. *See Ahmad v. Wigen,* 910 F.2d at 1066–67 ("The interests of international comity are ill-served by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced."); *see also Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911) ("We are bound by the existence of an extra-

dition treaty to assume that the trial will be fair.").

## Probable Cause

According to the terms of the Convention on Extradition, the responsibilities of an extradition judge are to determine (1) whether the accused has been "charged with ... any of the offenses mentioned in Article II of the present Convention;" (2) whether the offenses were "committed within the ... jurisdiction of [Israel];" and (3) whether there is probable cause that the accused committed the crime for which he is sought. *See* Convention on Extradition, Arts. I, II, & V.

I have already ruled that the crimes charged in the Israeli warrant constitute extraditable offenses.[14] According to the complaint, the charges against Abu Marzook occurred in the State of Israel and, therefore, were committed within the jurisdiction of Israel.

▉ The only remaining issue, therefore, is whether there is probable cause on any of the charged extraditable offenses. If so, I must certify Abu Marzook as extraditable. 18 U.S.C. § 3184. Counsel for Abu Marzook urges me to adopt a legal standard that would require Israel to show probable cause beyond a reasonable doubt. This incomprehensible approach would go against the clear terms of the treaty and of Title 18, Section 3184. Indeed, the two standards of proof—"probable cause" and "beyond a reasonable doubt"—are at opposite ends of the spectrum. A finding of probable cause is appropriate if the evidence supports a reasonable belief that Abu Marzook is guilty of the crimes charged. *See Austin,* 5 F.3d at 605.

All extradition charges against Abu Marzook stem from terrorist activities conducted by Hamas. Abu Marzook admits that he is the leader of the political wing of Hamas and that he has raised money for Hamas. (*See, e.g.,* Pet. for Hab. Corpus, Attach. A, Family Background of Abu Marzook, at 31). He further admits that there is a "propaganda apparatus" of Hamas which "was created to give a voice to the Palestinian movement toward self determination and that *one of its specific purposes was and is to disavow acts of violence committed by others but attributed to Hamas."* (Letter from Abu Marzook's attorney, Stanley L. Cohen, to the Court, dated March 26, 1996, at 3) (emphasis added). The latter admission is important because there is no evidence that Hamas has disavowed any of the incidents set forth in the Request for Extradition, and there is evidence that Hamas has taken credit for many of the incidents.

Israel has charged Abu Marzook with responsibility for the following ten incidents.

### July 28, 1990 Bombing

One person—a Canadian tourist—died from injuries caused by the detonation of a bomb on a beach in Tel Aviv. (Aff. of Miriam Golan ¶ 6). A person convicted of this offense—Yasser Khijazi—admitted that he had been a member of Hamas. (Golan Aff. ¶ 10).

The fact that Khijazi claims that he left Hamas prior to the incident is of no import to the determination of probable cause. Common sense tells us that a conspirator, upon being apprehended, will often make a false statement to this effect, so as to cover up for his co-conspirators. It is for this reason that our federal law presumes a conspirator remains a member of the conspiracy until he takes an affirmative step to disassociate himself from the conspiracy. *United States v. Minicone,* 960 F.2d 1099, 1108 (2d Cir.) (citing *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965)), *cert. denied,* 503 U.S. 950, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992).

In any event, this statement of Khijazi could only go to the weight of his admission and would not affect the determination of probable cause. *See Shapiro,* 478 F.2d at 901, 904–05 ("evidence of alibi or of facts contradicting the demanding country's proof ... may properly be excluded from the Magistrate's hearing."); *Eain,* 641 F.2d at 511–12.

I hold therefore that there is probable cause that the conspiracy known as Hamas

---

14. *See supra* pp. 575–77.

is responsible for the July 28, 1990 bombing murder of the Canadian tourist civilian.

*December 14, 1990 Stabbings*

Three civilians working in an aluminum factory in Jaffa, Israel, died of multiple stab wounds. (Golan Aff. ¶¶ 12, 14). There were writings on the walls of the buildings where the bodies were found, which included, "in the name of Mercy God on the 4th Anniversary of the Hamas," *id.* ¶ 13, and slogans praising Hamas. *Id.* ¶ 19. Ashraf Baaloogi ("Baaloogi") confessed to committing the murders with his accomplice Marouan Zeir. *Id.* ¶ 16. Baaloogi was convicted of the murders. *Id.* ¶ 17. The affidavit of Miriam Golan, an Israeli police commander, states that

> [Baloogi] claimed to have read a Hamas pamphlet that urged the Arab people to murder Jews and he decided he must do so. He contacted ... [an accomplice] and told him that he wanted to murder Jews because they should be murdered, according to what was written in the Hamas pamphlets.

(Golan Aff. ¶ 20).

A magazine article published in the January 1994 issue of "Filistine ALMuslema"—an alleged forum for Hamas— [15] contained the following entry (in Arabic):

> *TERRORIST ATTACK TO COMMEMORATE THE ANNIVERSARY OF THE HAMAS MOVEMENT* THE SONS OF THE HAMAS MOVEMENT, ASHRAF BALUJI AND HAMAJAD MARWAN ALZAYGHA DECIDED TO CELEBRATE THE ANNIVERSARY OF THE FOUNDING OF HAMAS IN A MANNER FITTING A MEMBER OF THE MOVEMENT. THEREFORE, THE TWO OF THEM ENTERED INTO THE ALUMINUM FACTORY ON DECEMBER 14, 1990, AFTER HAVING AGREED NOT TO LEAVE THE PREMISES WITH LESS THAN 15 DEAD. HOWEVER, THE SURPRISING INJURY OF ASHRAF BALUJI FORCED THE TWO HEROES TO HASTILY RETREAT AFTER THEY KNIFED TO DEATH THREE JEWISH INFIDELS, WRITING HAMAS SLOGANS ON THE WALLS. . . .

(Affid. of "Dror", attach. A–1, ¶ 1).

There is probable cause that the conspiracy known as Hamas is responsible for the December 14, 1990 stabbings.

*January 1, 1992, Shooting*

On January 1, 1992, an Israeli, Doron Shmuel Shurshan, was shot in the head and chest as he was driving a Peugot 504 in Kfar Darom in Gaza. (Affidavit of Avraham Barzilai ¶ 12–13). The victim died as a result of his wounds. *Id.* ¶ 13. A suspect, Hamis Akel ("Akel"), was arrested and gave a statement to the police on June 11, 1992. *Id.* ¶ 18. Akel stated

> I knew that a cousin, Walid Zacharia Akel, who was about 29 years old, from Nusarat, was a member in Hamas and was active in Hamas. I would go to him often and request that he let me join Hamas. . . . It was about that period [beginning of Gulf War] that Walid approached me and suggested that I join the military squad of Hamas for the purpose of investigating and killing resi-

---

15. Stanley Cohen, counsel for Abu Marzook, belatedly made the suggestion in open court on April 24, 1996, that there should be testimony taken from an editor of this magazine (who is located in London, England). Cohen mentioned this editor as a possible witness in a letter dated March 22, 1996, but he has failed to call this witness in any session of the hearing. He has also failed to explain what testimony could be expected, except to say that the editor "will describe his magazine, its policy and staffing and explain what relationship if any it bears to Hamas or any of its leadership or members." (Letter from Marzook's attorney, Stanley L. Cohen, to the Court, dated March 22, 1996, at 4).

In view of the admission by Mr. Cohen regarding the "propaganda apparatus" of Hamas (which would supposedly "disavow acts of violence committed by others but attributed to Hamas" by this magazine), *see, supra,* p. 30, I find that the proffered testimony is not material to the question of probable cause. At best, the matter would go to the weight of the evidence and is properly excluded.

Even Abu Marzook's witness, Imam Mohammad Al–Hanooti, acknowledged that the magazine conveys the views of Hamas. (Tr. Apr. 24, 1996, at 42).

dents of the territory who cooperate with the General Security Services. I agreed.

*Id.* ¶ 18(a).  Akel also stated

I went out in my car with Salah Abu Maruf.  I drove and I was armed with a Karl Gustav gun.  Salah Abu Maruf was in the back of the car and was armed with an Italian Beretta pistol.  We drove to the Kfar Darom Junction—Deir El Balach. . . .  Before we arrived at the intersection, we saw a car with yellow license plates, which stopped at the intersection. . . .  That was a beige Peugeot car. . . .  I stopped my car on the left side of the car driven by the Jew, and as we had agreed, Salah fired at the Jew.  One shot.  From this shot, blood came out of the Jew's mouth.  Salah fired three more shots.  The Jew fell on the steering wheel.  I turned around the car, to the right side of the Jew's car, and his car went up onto the divider strip between the two lanes of the road.  Salah fired another shot from the other side, and we drove off. . . .

*Id.* ¶ 18(b).

A magazine article published in the January 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic):

*TERRORIST ATTACK AT DEIR EL BALAH* ON JANUARY 1, 1992 A GROUP OF WARRIORS OF (AL AL-DIN) ALQASSAM SET UP AN AMBUSH AT DEIR EL BALAH FOR THE SECURITY OFFICER OF THE SETTLEMENTS IN THE GAZA STRIP, DORON SHOSHAN.  WHEN HIS CAR PASSED BY, ONE OF THE HEROES SHOT AT HIM FROM CLOSE RANGE, CAUSING HIS IMMEDIATE DEATH.

("Dror" Aff. Attach. A–1, ¶ 2).

The victim of the attack was a civilian. (Barzilai Aff. ¶ 19).

There is probable cause that the conspiracy known as Hamas is responsible for the January 1, 1992, shooting.

*May 17, 1992 Shooting*

Mohammad Abu Ataya ("Ataya") has been convicted of murder by an Israeli court for the murder of David Cohen, a civilian Israeli citizen who was found dead in the Beit La'hiah region.  (Affidavit of Avraham Barzilai ¶¶ 20–25).  Ataya gave a statement to the police, in which he stated:

(1) that he was a member of the military wing of Hamas;

(2) that he and Bashir Uda Hammed ("Hammed") and Mohammed Kandil—two other members of the military wing of Hamas—went to the La'hiah region and stopped a car which was driven by David Cohen; and

(3) that they "approached the vehicle of the same Jew, which we later heard that his name was David Cohen.  Then Mohammed Kandil pointed his rifle at the same David Cohen, and asked him in Hebrew 'what is your name?'  The Jew told him 'David'.  Then Mohammed Kandil fired one or two shots, I don't remember, at the head of the Jew and the Jew died." (*Id.* at ¶ 23).

There is probable cause that the conspiracy known as Hamas is responsible for the May 17, 1992, shooting.

*June 25, 1992 Stabbings*

Two Israeli civilians died of multiple stab wounds inflicted while they worked at a packing plant in Sajaeya.  (Barzilai Aff. ¶ 26).  Ataya was convicted for his part in these two murders.  *Id.* ¶ 31.  In his statement to police, he admitted that he, along with Talal Talab Salah ("Talal"), Yasser Namruti ("Yasser"), and Bashir Uda Hammed ("Bashir"), took part in the murders.  *Id.* ¶ 32.  According to Ataya, he and Talal were members of the military wing of Hamas.  *Id.*  Ataya also stated that

Yasser and Bashir told us that there are two Jews who are the owners of a vegetable factory in the El Kubeh area, and we need to go out and kill them. . . .  [When we got to the factory,] Yasser and I asked the workers whether they had vegetables for sale. . . .  [Yasser] took the knife out of his pocket and

started to stab the Jew in his chest. Then I, together with Talal, also took out our knives and started to stab in [sic] Jew in the stomach and chest.... Then he fell and the second, the Jew named Ami started to run towards us, and then Talal and Yasser ran to the second and started to stab him all over his body. And after I saw the first one was dead, I ran to help Talal and Yasser in order to kill the second one.... Bashir guarded us with the Karlo rifle and warned the workers that no one should move.

*Id.*

A magazine article published in the January 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic):

*TERRORIST ATTACK AT THE "CARLO" FACTORY AT 14:30 ON JUNE 25, 1992, FOUR WARRIORS FROM THE BATTALIONS OF THE MARTYR "AZ ALDIN ALQASSAM" ENTERED THE "CARLO" CITRUS FRUIT CANNING FACTORY NEAR THE NAHAL OZ CHECKPOINT. THREE OF THEM STABBED TWO SETTLERS, WHILST THE FOURTH ONE COVERED THEM. THE ISLAMIC RESISTANCE MOVEMENT, HAMAS, WROTE SLOGANS OF THE "AZ ALDIN ALQASSAM" BATTALIONS, IN WHICH IT STATED THAT THE ATTACK IS A "GIFT" FOR YITZHAK RABIN ON THE OCCASION OF HIS VICTORY IN THE ELECTIONS.*

("Dror" Affid., Attach. A–1, ¶ 4).

There is probable cause that the conspiracy known as Hamas is responsible for the June 25, 1992, stabbings.

*July 1, 1993 Shooting*

On July 1, 1993, a regular Egged bus (number 25) traveling from Neve Yakov in northern Jerusalem to the City Center of Jerusalem was attacked by three armed Hamas members. (Affid. of Ami Fhima ¶ 4). The attackers boarded the bus and fired their weapons at the passengers. *Id.* At least one civilian was killed in the attack. *Id.* Eight other persons were injured. *Id.*

One of the attackers was injured, but two fled. *Id.* ¶ 7. As they fled, they stopped a civilian woman in a car and forced her to drive them away. *Id.* ¶ 9. Her body was later found with gunshot wounds in her abdomen and chest, and an examination determined that she died from those wounds. *Id.* The two fleeing attackers were killed as they drove the dead woman's car in an attempt to escape. *Id.* ¶ 10.

The names of the attackers are Saleh Mustafa Utman (who was wounded), Maher Abu Sarur, and Mohammad Ahmad Hindi (the latter two were killed). *Id.* ¶¶ 11–13.

In October 1993, a statement was made by Fahed Salibi, in which he admitted being a member of Hamas. He was asked about the attack in Jerusalem on Bus 25, and he stated that "three months ago" the person who enlisted him into Hamas told him "to go to Bethlehem to pick up three persons who were going to carry out a terror attack in Jerusalem." *Id.* ¶ 14. Salibi stated that he took the three persons to a house near Jerusalem and saw that they had guns, hand grenades, and bombs. *Id.* Salibi also stated that the three men said they were going to attack a bus in French Hill the next morning. *Id.* Salibi also said, "the three hailed a cab, and went off in the direction of the French Hill intersection. That's all I know. Later, I heard on the news about the attack and that two terrorists were killed." *Id.*

A magazine article published in the January 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic):

*TERRORIST ATTACK BY THE TWO MARTYRS KHATEM MAKHTSAV AND YAKUB MATUWA ON THE MORNING OF JULY 1, 1993 THE WARRIORS OF THE BATTALIONS OF "ALQASSAM" GAVE RABIN A SLAP IN THE FACE, WHEN A FEDAYIN UNIT OF THE "ALQASSAM" BATTALIONS ATTEMPTED TO KIDNAP ONE OF THE ENEMY BUSES. THE NO. 25 BUS, IN THE WESTERN PART OF OCCUPIED JERUSALEM. THE ATTACK TOOK PLACE AT 07:20*

WHILST THE BUSES WERE FULL OF CIVILIANS ON THEIR WAY TO WORK.... A FIGHT BROKE OUT WITH ENEMY SOLDIERS AND PO-LICEMEN. THEREFORE THE WARRIORS, MAHUR ABU–SRUR AND MUHAMED ALHINDI, LEFT THE BUS AND COMMANDEERED A CAR DRIVEN BY A WOMAN SETT-LER. DUE TO A HEAD INJURY SUSTAINED BY THE WARRIOR OTTMAN SALAH, HE LOST CON-SCIOUSNESS, AND THE TWO WAR-RIORS DROVE INTO THE ENEMY CHECKPOINT.... THE TWO WAR-RIORS FELL AS MARTYRS AND THE WOMAN SETTLER HELD BY THEM WAS KILLED IN THE PRO-CESS. IN ADDITION, SEVERAL SOLDIERS AT THE CHECKPOINT WERE KILLED AS A RESULT ALONG WITH ANOTHER FEMALE PASSENGER ON THE BUS.

("Dror" Aff. Attach. A–1, ¶ 5).

There is probable cause that the conspiracy known as Hamas is responsible for the July 1, 1993, shooting.

*April 6, 1994 Bombing*

On April 6, 1994, at approximately 12:15 p.m. a suicide bomber detonated a bomb next to a regular passenger bus at a bus stop on Ninth Division Street in the City of Afula. (Affid. of George Krikorian ¶ 3). Eight persons were killed, and forty-six were injured. *Id.* All those killed were civilians. *Id.* ¶ 8. Forty-four of the injured persons were civilians. *Id.* ¶ 8. The deaths and injuries were caused by the blast, by burns from the resulting fire, and by pieces of metal (including nails) ripping into their bodies. *Id.* ¶ 9. The bomb comprised seven cylinders containing over five pounds of gas each, explosives, and more than 1,100 nails, loaded into a blue Opel Ascona. *Id.* ¶ 10. As the bomber drove the car alongside the bus, he detonated the bomb. *Id.* The bomber has been identified as Raad Muhamad El Nasar Zakarna ("Zakarna"), from Kabtiah. *Id.* at 14.

A statement was given to the police on July 13, 1994 by Muhamad AlHaj Salah, in which he stated that the same Raad Muhamad Zakarna recruited him into Hamas in April 1993. *Id.* ¶ 16. Muhamad AlHaj Salah also stated that on April 5, 1994 Zakarna said he would commit a suicide attack on April 6, 1994, at the Central bus station in Afula using a blue, 1987 Opel, car bomb. *Id.*

A magazine article published in the May 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic):

ON APRIL 6 1994 A MEMBER OF THE BATTALIONS OF THE MAR-TYR "AZ ALDIN ALQASSAM" DROVE A BOOBY–TRAPPED CAR WITH ISRAELI LICENSE PLATES. HE PARKED AT THE CENTRAL BUS STATION IN AFULA, WHICH WAS FULL OF PEOPLE, AND HE EXPLODED THE CAR AT 12:25....· IN A WRITTEN ANNOUNCEMENT LATER PUBLISHED BY THE BAT-TALIONS, THEY STATED THAT THIS SUICIDE ATTACK WAS TO BE ONE OF A SERIES OF FIVE GRAVE ATTACKS...."

("Dror" Aff. Attach. B–1, ¶ 6).

There is probable cause that the conspiracy known as Hamas is responsible for the April 6, 1994, bombing.

*April 13, 1994 Bombing*

A bomb exploded on an Egged interurban bus traveling its regular route from Afula to Tel Aviv. The explosion killed six persons, including four civilians, one soldier, and the terrorist who carried the bomb, and wounded thirty persons, including twelve civilians and eighteen soldiers. (Affidavit of Itzhak Bar ¶ 3). The terrorist who carried the bomb onto the bus was identified as Amar Salah Diav Amarna ("Amarna"), aged 21, from the village of Yabed. (*Id.* ¶ 7).

Sa'id Badarna ("Badarna") was tried and convicted for his part in this attack, which included helping Amarna prepare the bomb and plan the attack. Badarna gave a statement to the police on April 19, 1994, in which he told (1) how he was enlisted into Hamas in 1989; (2) how he recruited four persons, including Amarna, to join

Hamas; (3) how he reported to the news agencies that Hamas was responsible for the bombing carried out by Amarna. (*Id.* ¶ 14).

A magazine article published in the May 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic): "IN A WRITTEN ANNOUNCEMENT OF THE "ALQASSAM" BATTALIONS, THEY CLAIMED RESPONSIBILITY FOR THE ATTACK.... THE WRITTEN ANNOUNCEMENT ALSO STATED THAT THE ATTACK WAS CARRIED OUT BY AMAR SALAH AMARNA...." ("Dror" Affid. Attach B–1, ¶ 7).

There is probable cause that the conspiracy known as Hamas is responsible for the April 13, 1994, bombing.

### October 9, 1994 Shootings

Two terrorists, from Hamas, fired automatic weapons into a crowded downtown pedestrian mall on Nahalat Shiva in Jerusalem at about 11:45 p.m. (Affidavit of Amir Solomon ¶ 3). Two people were killed—one civilian—and eighteen were wounded. *Id.* The terrorists were shot and killed by police near the mall. (*Id.* ¶ 7). The two terrorists were Hassan Mahmud Abas ("Abas") and Isam Mahna Ismael Juabay ("Juabay"). (*Id.* ¶ 10).

Ayeman Sidar ("Sidar"), a person suspected by the Israeli police of being a member of Hamas, gave a statement to the police in which he relayed the following information:

> Hassan Natshay suggested to me that I join to the Battalions of Izz A–din Al–Qassam (the military wing of Hamas) and I agreed to that.

(*Id.* ¶ 12a);

> [Members of Izz A–din Al–Qassam] requested that I check for a place for an attack in Jerusalem.... [Later] I told them that I had found a place for an attack in Jerusalem on Jaffa Road.... There were two other people at this meeting. They were Hassan Abas, aged about 22–23 ... and Isam Juabay, aged about 20.... They told me these two people, Hassan Abas and Isam Juabay

would commit the attack in Jerusalem, and from what they told me, they will be willing to die in the process of killing people....

(*Id.* ¶ 12b).

Sidar also explained that he received the two automatic weapons, which were used in the attack, and gave them to Abas and Juabay on the day of the attack. He also stated that he took Abas and Juabay to the place of the attack, knowing that it would be a suicide attack. (*Id.* ¶ 12c).

A magazine article published in the November 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic):

> AT MIDNIGHT ON OCTOBER 9, 1994 AN ARMED ATTACK TOOK PLACE IN THE WESTERN PART OF JERUSALEM.... THE "ALQASSAM" BATTALIONS CLAIMED RESPONSIBILITY FOR THE ATTACK.... IN A WRITTEN ANNOUNCEMENT, THE BATTALIONS STATED THAT THE TWO PERPETRATORS OF THE ATTACK FELL AS MARTYRS, AND ADDED THEIR NAMES: ASSAM MAHANE ISMAIL MAHANE–MISRI, AND HASSAN MAHMUD ISSA ABBAS.

("Dror" Aff. Attach. C–1, ¶ 8).

There is probable cause that the conspiracy known as Hamas is responsible for the October 9, 1994, shootings.

### October 19, 1994 Suicide Bombing

An alleged Hamas activist identified as Salah Nazzal Sawie ("Nazzal") detonated a bomb attached to his body on a bus in Tel Aviv. (Golan Aff. at ¶ 21). Twenty-two civilians were killed and forty-six were injured as a result of the explosion. (*Id.* at ¶ 22). A suspect named Muatab Mukadi ("Mukadi") gave a written statement to the police.

According to Mukadi, "every time he saw Salah Nazzal he was together with Yichye Ayash [ ('Ayash'), a Hamas activist known as 'The Engineer' because of his connection to many explosions]." (Golan Aff. ¶ 26, 27). Mukadi stated that he had

assisted Ayash in the past by acting as a weapons courier. *Id.* at 27. According to Mukadi, Ayash asked for his assistance the day before the bombing. *Id.* Mukadi also stated that, at Ayash's request, he had allowed Nazzal to stay at his house and had driven Nazzal on October 19, 1994, to a bus station where he boarded a bus for Tel Aviv. *Id.* Mukadi also stated that Nazzal carried onto the bus a brown bag that Mukadi had purchased for Ayash. *Id.*

Unclaimed body parts at the site of the explosion were tested for a DNA match with Nazzal's parents. The pathologist confirmed that the body parts belonged to Nazzal. *Id.* ¶ 28.

A magazine article published in the November 1994 issue of "Filistine ALMuslema" contained the following entry (in Arabic): "AN ISRAELI BUS EXPLODED AT A BUS STOP IN THE HEART OF TEL AVIV AT AROUND 09:00 ON OCTOBER 19.... THIS IS ONE OF THE MOST SUCCESSFUL AND POWERFUL ATTACKS CARRIED OUT BY THE 'AZ ALDIN ALQASSAM' BATTALIONS/THE MILITARY ARM OF HAMAS." ("Dror" Aff. Attach C–1, ¶ 9).

There is probable cause that the conspiracy known as Hamas is responsible for the October 19, 1994, suicide bombing.

### Abu Marzook's Involvement

Since I have found there is probable cause to believe that the conspiracy known as Hamas is responsible for the ten incidents described above, I must now examine Abu Marzook's alleged involvement in the conspiracy. Abu Marzook argues that

*Nowhere* in the complaint, or any of its supporting documentation, is there the slightest evidence that Dr. Abu Marzook knew of any of these alleged crimes, that he intended that they occur, that he knew of them before and had the power to stop them, or that he in any way directly or indirectly engaged in committing the specified crimes.

(Extrad.Mem. at 86). He also states that "the Government has failed to advance in its submissions ... *anything* establishing that Dr. Abu Marzook ordered, suggested, or even knew of the specific charged acts of violence, or that Dr. Abu Marzook knew the participants in the specific charged acts of violence." (Response to Gov't Answer dated May 3, 1996, at 2). But this ignores the law of conspiracy and how criminal liability can attach to co-conspirators.

A finding of probable cause for Abu Marzook's criminal liability hinges on his knowledge and intent as a leader in Hamas. The extradition complaint alleges that Abu Marzook

is the head of the political bureau of the Hamas Organization.... In addition to its other functions, this bureau has responsibility for directing and coordinating terrorist acts by Hamas against soldiers and civilians in Israel and the territories. In his role as head of the political bureau, Abu Marzook financed certain activities of the Hamas, including terrorist activities. In addition, he played an important role in organizing and structuring Hamas and in supervising the activities of the wing of Hamas responsible for the terrorist attacks [*i.e.* the military wing] and in appointing individuals to important leadership roles in the military wing.

(Extrad.Compl. at 4).

To prove Abu Marzook's responsibility for the acts done by the Hamas conspiracy, Israel would not need to show that Abu Marzook knew of the specific acts committed in furtherance of the conspiracy, nor that he intended that they occur, nor that he even indirectly engaged in committing the specific crimes. Israel need only show that Abu Marzook was involved in an "agreement to accomplish an unlawful act," *United States v. Masotto,* 73 F.3d 1233, 1241 (2d Cir.1996), and that the charged incidents were "reasonably foreseeable consequences" of the conspiracy. *Pinkerton* 328 U.S. at 643, 66 S.Ct. at 1182. Moreover, the existence of the conspiracy may be established "through circumstantial evidence, which only needs to demonstrate a tacit understanding between the conspirators to carry out an unlawful act." *Id.* There is no requirement to prove that Abu Marzook "knew every objective of the conspiracy, every detail of the scheme's oper-

ation, or the identity of every coconspirator." *United States v. Wiley*, 846 F.2d 150, 153–54 (2d Cir.1988).

■ Under the *Pinkerton* theory of liability, Abu Marzook "can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were *reasonably foreseeable consequences* of acts furthering the unlawful agreement, *even if he did not himself participate in the substantive crimes.*" *Id.* (emphasis added).

There is more than sufficient evidence to show that Abu Marzook was a member of the conspiracy known as Hamas and that the acts charged against him were foreseeable consequences of the conspiracy.

Abu Marzook admits that he is "a prominent leader in the political wing of Hamas, and indeed, ... its *de facto* ambassador to the world." (Pet. for Hab. Corpus, Attach. A, Family Background of Abu Marzook, at 31). Abu Marzook also admits that the evidence shows that he transferred $7000 to Abu Ahmad, who has said that Abu Marzook gave him money for the military wing of Hamas. (Extrad.Mem. at 103).

Furthermore, additional evidence shows that Abu Marzook knew that Hamas members were committing acts of terrorism against civilians in furtherance of the goals of Hamas.

On October 10, 1994, Abu Marzook appeared in a television interview broadcast from the "Al Manar" television station in Lebanon. This was only one day after the October 9, 1994 shootings described above, in which two Hamas terrorists killed two and wounded eighteen persons in a suicide attack on a pedestrian mall in downtown Jerusalem. The interview went as follows (translated from Arabic by the Israeli government):

Q: The Izz Al–Din Al–Qassem battalions [*i.e.* the military wing of Hamas] gave an open declaration about the heroic attack in Jerusalem as a new stage on the way to the Holy Jihad. We also noticed that *when assuming responsibility,* you used the expression "God absolves those who die sanctifying Allah" (a quote from the Koran)—following the two casualties of the attack. Does this mean that the Hamas movement has decided to adopt suicide actions as a means to fight the occupation?

A: Death is a goal to every Muslim and every fighter wants to die on Palestinian land. This is not the first time that the Izz Al–Din Al–Qassem heroes carry out suicide and terrorism actions.

Q: The Zionist enemy noted that one of the attackers was a Palestinian policeman from the 'En Ghalout forces, who entered the Gaza Strip from Egypt. Source also reported that the dead man joined the Al–Qassem battalions in July, and continued his activities as a policeman. Observers said that these reports, if true, will have a negative effect on the current negotiations with the Palestinians. How true are these reports, according to the information at your disposal?

A: The peace process, as described by Arafat more than once, is a failure. By these actions, we do not strive to foil the talks and the negotiations. We are doing them for a much higher aim and they are steps on the way for a full restitution of the rights of the Palestinian People.

(Extrad.Compl., Aff. of "Ayal", Attach. 17, AE–1, at 2). Although Abu Marzook has questioned the accuracy of this translation, he relied upon the last paragraph as support for the notion that he is a political voice for disenfranchised Palestinians. (Extrad.Mem. at 106) (citing Extrad.Compl., Aff. of "Ayal", Attach. 17, AE–1, at 2). The section cited by Abu Marzook acknowledges and encourages the use of suicide attacks and terrorist actions by Hamas. And, if there is any doubt that he was referring to violent actions, the succeeding passages of the interview make clear that he endorses the violent attacks carried out by Hamas:

Q: What about the assessments that one of those killed is a Palestinian policeman?

A: We believe that one day the entire Palestinian police will join the ranks of its people and join the *fight against the enemy.*

Q: Christopher denounced the action and called to Arafat to denounce it and prevent similar actions in the future. We also saw that Faisal Al–Husseini also denounced the

action. What are your expectations as regards Arafat's reaction to Christopher's instructions?

A: *Arafat promised to stop the attacks* since the signing of the Cairo Agreement and he said that they were obliged to do their best to do so.

Arafat has no connection with this kind of activity and *he cannot prevent it.* The Hamas movement has been expressing its opposition and rejection of the agreement for a long time, and explained that it *will continue according to the principle of the Jihad* and God's instructions and will stick to its stand.

Arafat is incapable of forcing the Hamas to stop the actions.

(Extrad.Compl., Aff. of "Ayal", Attach. 17, AE–1, at 2–3) (emphasis added).

At the extradition hearing, Abu Marzook offered testimony from Imam Mohammad Al–Hanooti, who testified about the different meanings which should be attributed to the terms "Jihad" and "martyrdom." The Imam testified that, to a Muslim, Jihad means "to strive" to do what is right; this can range from defending one's beliefs and self to offering assistance to others despite threats to one's self. Martyrdom, the Imam said, is the loss of life while engaged in Jihad. I must admit that these concepts are admirable, and almost every religion encourages efforts in the name of a collective good, even if death may be the consequence. Nonetheless, the context shows that Abu Marzook used these terms as emotionally loaded words intended to conceal reality and the truth. The testimony of Imam Al–Hanooti on cross-examination shows this. When the Imam was faced with a hypothetical question based on the facts of the October 9, 1994 shootings, he indicated that the attack could not be "Jihad" as understood by the consensus of Muslims. (Tr. Apr. 24, 1996, at 47–51). Yet, "Jihad" was used by Abu Marzook.

In addition to the evidence cited above, Israel has submitted statements of a co-conspirator named Abu Ahmad, also known as Muhamad Salah, who admitted to being the head of the military wing of Hamas. One particular statement is especially damning, not only because it directly implicates Abu

Marzook, but also because it was hand-written by Abu Ahmad to give to persons whom he thought were members of Hamas. In this handwritten statement, of August 21, 1995, he states the following:

I started out with the Muslim Brothers in 1978, with Sheikh Jamal Said, who serves as Sheikh of the Mosque of the Arab community in Chicago. Activities for Palestine began after the Intifada broke out, under the aegis of a body called "Palestine Organization/Enlistment" (Thanahim Falestin), declared by the Muslim Brothers to be a leadership body.... Our activities for Palestine were placed at the top of the list of priorities, preceding the Muslim preaching of the Muslim Brothers.

*My Ties with "Palestine Organization/Enlistment"*

Musa Abu Marzook, in charge of the activity, was responsible for the Muslim Brothers Organization in the U.S. and resigned from this job in order to devote his time to activities dedicated to Palestine.

My task was to collect names of Brothers and to mention them during the first meeting in the U.S., attended by Muslim Brothers from Palestine, the occupied land. I carried out this activity in the name of the Security Committee....

. . . . .

The activity was conducted as follows:

A. Collection of all the names of Palestinians from the occupied land, together with the following details:

—their fields of study

. . . . .

—their ability to express themselves, military activity, and the ability to work with chemical materials

. . . . .

B. About 27 names were sorted, according to their expertise in chemical materials, toxins, physics, military education and knowledge of computers.

C. These Brothers were tested and they were given materials from their fields of expertise, such as remote-control activation, agricultural pesticides and basic

chemical materials for the preparation of bombs and explosives....

.   .   .   .   .

[D]uring the war the activity was stopped for the following reasons:
—my arrest
—after Abu Marzook visited Lebanon, it was suggested that they [three military trainees] be dispatched to additional courses.

.   .   .   .   .

I began to resume the ties with the people in Jordan and in the U.S. following a wave of arrests in Jordan....

Following the contact between Musa Abu Marzook, Abu Hani and myself, the activity was resumed, and it was assumed that I would continue it....

All this occurred between the end of 1991 and early 1992, until Abu Hani returned to the U.S. The Brother Munzar (a fugitive from Jordan) and myself undertook to deal with the security committee affairs, in cooperation with Musa Abu Marzook.... About a month before I arrived, brother Musa Abu Marzook asked me to leave my current activities, connected with my salary and to dedicate myself to military activity.... I responded in the negative, because my expenses in the U.S. were many and I could not subsist on what the movement would give me. Nevertheless, we agreed to continue discussions in order to reach a situation which would fit in with my standard of living and the situation of the movement. This discussion was held two days before my trip here.... One of the reasons for my trip is to investigate the military situation in the Gaza Strip and the West Bank and to assess, on the basis of the situation, whether I was capable of carrying out this assignment.

.   .   .   .   .

*My Trip to Israel, August 1992*

After Abu Abada left the West Bank for the West, he called me through Musa Abu Marzook and I met both of them. The following came up during the meeting:
A. The military situation in the West Bank is frozen and it has to be revived

by means of the following people, whom Abu Abada knows: ....

(Extrad.Compl. Attach. 10, Nadav 4E at 1–7);

He [Adel] consulted me about the murder of Sari Nusseiba. I mentioned the subject to Musa Abu Marzook and he supported the matter in principle.

(*Id.* at 8);

I told him [Salah Arouri] about the idea of reviving military activity and he told me that there were many people who were ready to act, but he needed money to buy weapons, vehicles and other things. I gave him 100,000 on the basis of a weapons deal offered him.... [After his return to the U.S.] he asked me for money and I told him the (Muslim) Brothers feel that so far, there has been no activity in the West Bank. Then I referred him to Brother Musa Abu Marzook, and they talked on the telephone. It was agreed to pass a sum of money to Brother Salah and he sent me the number of the account by facsimile.

(*Id.* at 9–10);

Abu Majhad described the situation in Gaza, after the death of Al–Namrouti. He told me how Abu Saab is the temporary operative in charge of the Izz Al–Din Al–Qassem Battalions. I handed him a letter from Musa Abu Marzook, saying that the person in charge on behalf of Izz Al–Din Al–Qassem [the military battalions of Hamas] would replace Abu Saab, the temporary operative in charge since August 1992.

(*Id.* at 11);

This meeting [with Abu Saab] was held after the meeting with Abu Majahad.... He explained to me the situation regarding the squads in Gaza and told me that he had 53 people ready for action....

At the end of the meeting with Abu Saab, we agreed that I should pass on his report verbally, and especially his desperate need for large sums of money. This money is necessary mainly for the procurement of weapons....

This is where the 1992 trip ended. I handed the written report over to Musa Abu Marzook only. . . .

(*Id.* at 12–13);

I gave Marwan Hawaja 60,000 dollars, on Adel's instructions, agreeing that in future times I would transfer the money via bank accounts which Marwan and I use separately. . . .

The following sums were allocated: —50,-000 (Dollars) Abu Saab/Gaza—military activity. Abu Majahad asked me to give him this because they needed it urgently.

(*Id.* at 17–18);

The second meeting was between Abu Majahd and myself. . . . This is what occurred during the meeting: he explained the financial tragedy in the Gaza Strip. . . . This is disruptive for many activities, especially military (the military budget of the Gaza Strip is 300,000 dollars and what I have is an addition—for any deal proposed, and talk was of 100,000 dollars).

(*Id.* at 20);

*The Meeting with Abu Saab*

One meeting was held and another meeting was planned. The requirements of Al-Qassem were discussed: shelter, weapons, training.

(*Id.* at 21);

*Sa'adon's Body*

I began with Musa Abu Marzook. He took out a sketch of the location of the body and said he thought that someone should be found to make an agreement, before it is taken out of our hands.

(*Id.* at 26);

I met him [Abu Ali] through Brother Musa Abu Marzook. I don't know anything about him, except for the telephone number, and he is the Brother I called most, due to the difficulty in arranging the meetings in Gaza.

(*Id.* at 43);

They [Israeli interrogators] asked me about the charity associations who gave me the money and I told them the money was deposited by Abu Abada. I don't know

what the source is exactly, but there are 31 charity institutions collecting funds for the Islamic world. The mosques also collected funds for the deportees during the Friday prayers, immediately after the deportation. Since there is a large Islamic community in Chicago, they collected an enormous amount of money, and that is what brought me before the others, and the correct thing is that the money was deposited by Musa Abu Marzook and Brother Ismail Al-Barghouti.

(*Id.* at 44);

*Clarifications*

125. Loui Qassem—I received his name from Musa Abu Marzook. . . . There is a code-word and it is his underground name. The person who instructed me to turn to him was Musa Abu Marzook, and they are from our line (Hamas).

126. Al-Arouri—I think you mean Al-Ouratani. . . . But if you mean Al-Arouri: the person who introduced me to him is Abu Abada. Abu Abada and Musa Abu Marzook instructed me to contact him in 1992, before I came here.

(*Id.* at 58); and

In Gaza I met Brothers who were tired of the little military action and gave me a letter threatening that if the Brothers abroad did not help us we would do what we like. This was after brother Musamah gave them instructions to carry out an action again. The only one who was in the picture at the time, from America, was Musa Abu Marzook, and then Brother Abu Musamah was arrested.

(*Id.* at 63).

Other Hamas members have also given statements, which either implicate Abu Marzook or corroborate the statement of Abu Ahmad.

Sayed Abu Musamah, an admitted Hamas member, made the following statements:

*Statement of January 13, 1991*

. . . At one of the meetings I attended I met one Abu Omar,[16] a Palestinian of about 25–35 from the Gaza Strip area and

---

**16.** There is evidence that this is an alias for Abu Marzook. *See* Sufian Abu Samara statement of Jan. 7, 1991, *infra* p. 590, and Bassam Musa statement of Feb. 22, 1993, *infra* p. 591.

we became friends. I completed my studies around 1986 and returned to the Gaza Strip. About seven months after the arrest of Sheikh Ahmed Yassin and the other functionaries of the Hamas in the Gaza Strip, Abu Omar, whom I met in Saudi Arabia came to my house and told me that because the GSS had arrested the people in charge of the Hamas organization then I have to recruit people and to re-establish the Hamas organization in the Gaza Strip, in order to continue the Intifada activity and that I should be in charge of the Hamas organization in the Gaza Strip . . . and I agreed.

. . . In the beginning Abu Omar gave me a check-book of the Bank of America and it comprised signed checks and I just had to write the sum for activities of the Hamas organization in the Gaza Strip.

But I didn't use this check-book . . . and I asked Abu Omar to send a messenger to my house every time to bring me the money. From time to time from that day someone I don't know would come to me and he would tell me that Abu Omar sent him and he would bring me money. In this way I received a total of about 100,000 dollars and one time the messenger brought me money and also gave me the telephone number of Abu Omar in America.

(Barzilai Affid. attach. 1E).

*January 27, 1991*

Around the end of 1989 about seven months after Sheikh Ahmed Yassin was arrested in May 1989, I was asked by Abu Omar to found a Hamas organization in the Gaza Strip.

(Barzilai Affid. attach. 2E).

Sufian Abu Samara, an admitted Hamas member, made the following statements:

*Statement of January 7, 1991*

[In about 1979] I acquainted a young man from Rafah, called Moussa Abu Marzuk, AKA 'Abu Omar' and after the ties between us became closer he told me that he was a member of the Egyptian Muslim Brotherhood [the precursor to Hamas]. . . . [A]fter the wave of arrests inflicted on Hamas [in 1989] he [Moussa Abu Marzuk]

initiated approaching many people to fill the vacuum created after the arrest of the organization's activists. . . . Moussa also warned against the collapse of the movement if no infrastructure is established which will continue the organization's activity in the Strip. . . . And Moussa also determined the method of receiving the sums of money and explained that a fellow whom I do not know will come to me and will tell me that he has something for me from Abu Omar and I will accept it, meaning the money, and I will transfer it. . . .

When I was still in the Gaza Strip Abu Omar established that we must set up apparatuses which will move the wheels of the Hamas movement. . . .

(Barzilai Affid. attach. 3E);

*Statement of January 14, 1991*

Abu Omar gave us signed checks on banks in the U.S. . . . Abu Omar used to deposit funds into the checking accounts that he left us and Dr. Halil actually kept the checks. The first time Abu Omar deposited into the account one hundred thousand dollars and Halil brought me the sum.

(Barzilai Affid. attach. 4E);

Bassam Musa, an admitted Hamas member, made the following statements:

*Statement of January 30, 1993*

I transferred 50 thousand dollars to Abu Mazen, commander of the military apparatus and 50 thousand dollars I distributed to areas in the Gaza Strip. I also had contact with two Palestinians and Americans namely Palestinians. The first I came to know was alias Abu Ahmad, and he is in charge of the activity of the military apparatus. About four months ago [about Sept. 30 1992] Abu Ahmad arrived in the Gaza Strip and . . . I met with Abu Ahmad. . . . We also discussed financial problems. . . . I received from Abu Ahmad 30 thousand dollars for the areas in Gaza. He also had with him 30 thousand dollars for the commander of the military apparatus Abu Saab.

(Barzilai Affid. attach. 5E);

*Statement of February 21, 1993*

[A]bout half a year ago Zakaria Zin Al-Din, responsible for Gaza, told me that Iz

Al–Din Sheikh Khalil . . . left his position in favor of special activity. I understood what this was about and after about two months I transferred the sum of 7 thousand dollars to the military apparatus. . . . At that time I received a message saying that the person in charge of the military apparatus was under administrative arrest. . . . I sent faxes abroad with secret codes, in which I called the Jews Sons of Sabbath, referred to the jail as the Dinar House, and the military apparatus as the positive apparatus. . . . I passed money to the military apparatus for financing the activity—some 370 thousand dollars. This money arrived from abroad and the decisions regarding its distribution were also made in the HQ abroad. . . . Some two weeks before I was arrested the two messengers, Abu Ahmad and Juma'ah Ibrahim, arrived in the Gaza Strip from the United States. . . . Abu Ahmad is the representative of the military apparatus and Jumaah Ibrahim is the representative of the other apparatuses. . . . I arranged a meeting . . . between Abu Ahmad and Abu Saab. . . . I arrived there before time and met Abu Ahmad and received 30 thousand dollars from him.

(Barzilai Affid. attach. 7E);

*Statement of February 22, 1993*

Hamas HQ Abroad—It is known that Mussa Abu Marzuk, AKA Abu Umar, is the head of Hamas and generally stays in Jordan. I received many faxes through Abu Ali–Wail Banat from him and the Hamas spokesman in Jordan is Ibrahim Ghusha. Mussa's deputy is Abu Bashir Al–Zamili. In the U.S. there is another senior person in charge and he is called 'IBN AHMAD'.

(Barzilai Affid. attach. 8E).

Salah Arouri, an admitted Hamas member, made the following statements:

*Statement of January 27, 1993*

My activity lasted two years until 1990. In my talks with Muayn Shabib we agreed that we should recruit young people to purchase weapons and prepare squads for military activity. . . .

(Neoti Affid. attach. 1E);

*Statement of March 2, 1993*

In August 1992 I met Abu Ahmad at the university in Hebron and he gave me a telephone number in Chicago and a fax no. so that I be able to contact and keep in touch with him. . . . [Around October 1992] I contacted Abu Ahmad at his Chicago no. from the A–Sharak office in East Ramallah. . . . He said that he wanted to give me weapons but nothing came of this. I asked for money from him so that I could buy extra weapons. Abu Ahmad passed the phone on to another person so I could talk to him. I do not know who that person was but according to his accent he was from Gaza. He said he would send me money and asked me for a bank account no. so that he could transfer money to me.[17] . . . I received 96,000 American dollars from Abu Ahmad which he gave me personally in the ABD Al–Nasser Mosque in Al–Bireh, he told me that the money was meant for our weapons procurement activity.

(Neoti Affid. attach. 2E);

*Statement of March 8, 1993*

Today I was asked to come and identify the picture of the man who had given me money to finance Hamas activity in the area called Abu Ahmad, a resident of Chicago America. The man's name is Ahmad Salah.

(Neoti Affid. attach. 3E).

In addition, Israel has submitted bank records which corroborate statements made by Abu Ahmad regarding transfers he made on behalf of Hamas. Specifically, from August 12 through September 12, 1992, Abu Ahmad's account in the LaSalle Talman Bank of Chicago received $52,000. (Affid. of Ephraim Rabin ¶ 6, and attachments). During that period, he wrote ten checks in the amount of $5000 each, and those checks were cleared through a bank in Tel Aviv, Israel. *Id.* On January 19, 1993, the amount of $200,000 was transferred from Abu Ahmad's Chicago account to an account at the First Chicago

---

**17.** Compare with the statement of Abu Ahmad, *supra,* p. 588.

Bank of Ravenswood in the name of Ribhe Abdel Rahman, a money changer in Ramallah (West Bank). *Id.* ¶ 8.

Israel has also submitted bank records tending to show that Abu Marzook transferred large sums to Abu Ahmad's Chicago bank account. On December 29, 1992, a wire transfer in the amount of $300,000 was made from a joint account held in the names of Abu Marzook and Ismail Selim Elbarasse. *Id.* ¶ 10. Similar transfers were also made on January 20, 1993, and January 25, 1993, in the amounts of $135,000 and $300,000, respectively. *Id.* On January 21, 1993, a wire transfer of $50,000 was made to Abu Ahmad's account from Nasser Alkhatib, Abu Marzook's personal secretary. *Id.* ¶¶ 12–14. Furthermore, bank records reveal that on August 8, 1992 and November 27, 1992, Abu Marzook wrote checks to Abu Ahmad in the amounts of $5000 and $2110, respectively.

In light of the evidence offered against Abu Marzook, I find that there is probable cause to believe Abu Marzook engaged in and intended to further the aims of the conspiracy by his membership in and support of the Hamas organization. I also find that probable cause exists that Abu Marzook knew of Hamas's plan to carry out violent, murderous attacks, that he selected the leadership and supplied the money to enable the attacks to take place, and that such attacks were, therefore, a foreseeable consequence of the conspiracy.

### Admissibility and Reliability of Evidence

██ In his memorandum opposing extradition, Abu Marzook argues that an "extradition complaint may not be founded purely upon multiple hearsay." (Extrad.Mem. at 110) (citing, *inter alia, Rice v. Ames,* 180 U.S. 371, 21 S.Ct. 406, 45 L.Ed. 577 (1901)). However, the standard for admissibility of evidence in this hearing is not left to judicial discretion. Rather, Congress has determined that

Depositions, warrants, or other papers or copies thereof offered in evidence upon the

hearing of any extradition case *shall be received and admitted as evidence* on such hearing *for all purposes* of such hearing if they shall be properly and legally authenticated....

18 U.S.C. § 3190 (emphasis added). Since Israel has properly authenticated the documents submitted with the extradition complaint, I must consider them, regardless of their hearsay content.

██ In my Memorandum dated April 11, 1996, I held that the question of the weight or reliability of the evidence of the demanding country is not before me as an extradition magistrate. I must accept as true all of the statements and offers of proof by the demanding state. *See Shapiro,* 478 F.2d at 901, 904–05 ("evidence of alibi or of facts contradicting the demanding country's proof ... may properly be excluded from the Magistrate's hearing"); *Eain,* 641 F.2d at 511–12. Accordingly, the testimony of Abu Marzook's proposed witnesses on this issue was deemed irrelevant to this proceeding.

Abu Marzook alleges that "the translations of statements, supposed confessions, and interviews are riddled with errors and must be reconstructed." (Extrad.Mem. at 108, 123). However, when given the opportunity to explain, he focused solely on alleged mistranslations of the audiotape interviews of Abu Ahmad, and on an alleged mistranslation of an interview of Abu Marzook published in the October 14, 1994 issue of the "Al–Ahed" weekly paper.[18]

In any significant area of the tapes, the differences in translation are purely *de minimis* and are of no import whatsoever. However, I have totally disregarded these tapes and the Al–Ahed interview. Even without these items, I find that the additional evidence presented by Israel is more than sufficient to certify the extraditability of Abu Marzook.

Abu Marzook also argues that "at least one key interrogation tape of Muhammad Salah [a/k/a Abu Ahmad] was apparently manipu-

---

**18.** Abu Marzook has submitted an affidavit of "a professional Arabic translator" who stated that in his opinion the Israeli translation of the interview is not true and accurate. Abu Marzook does not deny that he gave the interview or that the article submitted by the Israeli government was actually published. Nor does he argue that the publication misquoted him. Abu Marzook's only challenge is to the accuracy of the translation offered by the Israeli government.

lated and or altered by mechanical means." (Extrad.Mem. at 125). To support this argument, Abu Marzook submitted an affidavit of an "expert" who concluded that there are possibly two alterations on one tape. Abu Marzook did not indicate which of the tapes was apparently altered; he did not state what part of the transcript might be affected by the alteration; and he did not state whether he had tested all the tapes. The reliability of the taped statements is not significantly diminished by Abu Marzook's assertions of tampering. But, in any event, I have not relied on these tapes in making my decision.

Abu Marzook also argues that the written statements of Abu Ahmad are inconsistent and are the product of torture. Abu Marzook has submitted a photocopy of a faxed affidavit of Abu Ahmad, which alleges that the statements he gave to the Israeli officials were "in material respects completely untrue, particularly insofar as they relate to my knowledge of and relationship with Dr. Mousa Abu Marzook." (Hab.Pet.Exh. D, ¶ 7). According to Abu Marzook, Abu Ahmad's statements should be disregarded or used as evidence of Abu Marzook's innocence. I disagree.

The purpose of this hearing before me was not to weigh the evidence in an attempt to determine the guilt of Abu Marzook, but to determine whether the evidence supports a reasonable belief that Abu Marzook was guilty of the crimes charged. *See Austin,* 5 F.3d at 605. Abu Ahmad's confession corroborates other evidence offered by Israel. Moreover, Abu Ahmad's statement of August 21, 1995, has certain hallmarks of reliability which cannot be ignored. That statement was hand-written by Abu Ahmad. He gave this statement to persons he thought were Hamas members, because he wanted to show that he possessed significant information about Hamas membership and leadership. (Hab.Pet.Exh. D, ¶ 9). Therefore, the confession of Abu Ahmad supports a reasonable belief that Abu Marzook was guilty of conspiracy and of the substantive crimes charged.

*CONCLUSION*

Since this Court has jurisdiction to hold the extradition hearing pursuant to Title 18, Section 3184, Abu Marzook's pre-hearing petition for *habeas corpus* is denied.

The foregoing constitutes this Court's findings of fact and conclusions of law after a hearing. The documentary evidence, together with all transcripts of testimony and argument shall be certified to the Secretary of State, that a warrant may issue for the surrender of the accused, MOUSA MOHAMMED ABU MARZOOK, in accordance with the Convention on Extradition between the United States and Israel. The accused is hereby ordered committed to the Bureau of Prisons, Metropolitan Correction Center, New York, New York, there to remain until such surrender to the authorities of Israel when the appropriate diplomatic officials so designate.

SO ORDERED.